## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

MARY J. C. GARCIA,

                Plaintiff,

v.                                                            No. CIV  02-0525 JB/RLP

DONALD H. RUMSFELD, Secretary,
Department of Defense,

                Defendant.


## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Defendant's Motion for Summary Judgment (Doc. 35).  The primary issues are whether the investigation conducted on the Plaintiff, Mary J. C. Garcia, is an adverse employment action and whether Garcia has shown a genuine issue of material fact regarding pretext.  Because the investigation was not an adverse employment action, because the Defendant has articulated legitimate, non-discriminatory reasons for its actions, and because Garcia has not shown that the reasons were pretextual, the Court grants the motion for summary judgment.

## FACTUAL BACKGROUND

Garcia admits that many of the Defendant's factual statements are true.  Garcia also admits that the Defendant's chronologies of the events are accurate.  There are only a few issues that Garcia attempts to dispute and to argue should preclude the entry of summary judgment.  These few issues do not, however, change the outcome of the Court's ruling on this summary judgment motion.

Garcia is in protected categories as a result of her gender (female), race/ethnicity (Hispanic), age (57 at the time of these occurrences), and participation in Title VII and ADEA proceedings.  See

1

Affidavit of Mary J.C. Garcia ¶ 1, at 1 (executed August 12, 2003). In 1997, and at all times material to her case, the Department of Defense's Defense Special Weapons Agency ("DSWA") -- now the Defense Threat Reduction Agency -- employed Garcia at Kirtland Air Force Base. See Declaration of Frank J. Prewitt ¶ 2, at 1 (executed June 28, 2003); Garcia Aff. ¶ 2, at 2. Her commanders were, at Headquarters DSWA, Major General Gary Curtin, Commander; at Kirtland AFB, DSWA Commander Air Force Col. Steven C. Hafner, Deputy Commander; Navy Commander Dean Sedivy; and immediate supervisor, Air Force Col. Frank Prewitt. See id.

From May 14, 1995 through August 9, 1997, Garcia served as GM-334-14 Division Chief of the Top Secret Stockpile Control Division and Project Officer or Manager for the Nuclear Management Migration Project ("NUMIS-M" or "the Project"), a top secret project involving the migration of nuclear stockpile data from a Honeywell main frame computer to a client server. See Prewitt Decl. ¶ 2, at 1; Garcia Aff. ¶ 4, at 2. As Division Chief of the Stockpile Control Division and Project Manager, Garcia supervised 38 employees. See id. Garcia was subject to duty call 24 hours a day, traveled widely throughout the United States and overseas, and received numerous awards (including cash) and letters of appreciation from high level military officials. See id.

Garcia successfully held various positions with the Department of Defense over a period of about 40 years of employment, rising from secretary to GM-14 Manager. See id. ¶ 5, at 2. As the Division Chief of Nuclear Stockpile and the NUMIS-M Project Manager, Garcia managed a high visibility project that received the most finances from the DSWA Headquarters' Command. See Garcia Aff. ¶ 6, at 2.

Although Garcia was an "overtime exempt" employee, DSWA allowed her to earn overtime on the Project if she worked more than forty hours for any given week. See Prewitt Decl. ¶ 4, at 2.

2

DSWA needed to approve the payment of overtime in advance and limited payment to work that Garcia performed on the Project.  See id.  On March 12, 1997, an anonymous individual called the DOD - Inspector General Hotline and lodged a complaint accusing Garcia and two other DSWA employees, Alfredo Martinez and Gary Clark, of engaging in time and attendance fraud.  See id.  ¶ 5, at 2.

On April 4, 1997, Col. Michael Callaway, Chief of Staff, DSWA, directed the Inspector General for Field Command DSWA -- Col. John Crandley -- to conduct an investigation regarding the allegations that the Hotline complaint raised.  See id.  Crandley found evidence to substantiate some of the charges of time and attendance abuse.  See id. ¶6, at 2.  Crandley concluded that DSWA paid Garcia for overtime pay -- at $24.54 per hour -- for 32 hours that she did not work.  See id.

On or about July 16, 1997, Crandley met with Prewitt, to discuss his investigation's results.  See Prewitt Decl. ¶ 6, at 2.  Crandley informed Prewitt of the results of his investigation and recommended, among other things, that: (i) Garcia be removed from any supervisory role at DSWA; (ii) Garcia's security clearance be revoked; (iii) Garcia repay the agency; and (iv) an inquiry be conducted to determine whether she had retaliated against individuals providing information to him during his investigation.  See id. ¶ 7, at 2-3.  Prewitt was surprised and disappointed.  See id. ¶ 8, at 3; Sedivy Decl. ¶ 5, at 2.  He was surprised because he had assumed all along that Crandley would exonerate Garcia.  See Prewitt Decl. ¶ 8, at 3.  Prewitt was disappointed because the results of the investigation raised serious questions about Garcia's integrity.  See id.

After discussing the matter with Crandley and reviewing his report, Prewitt concluded that Garcia's conduct warranted disciplinary action.  See id. ¶ 9, at 3.  On August 8, 1997, Crandley informed Prewitt that DSWA could not, pursuant to DOD Inspector General regulations, use

Crandley's investigation report to discipline Garcia.  See id.  As a result, Prewitt conducted his own investigation using and reviewing DSWA time and attendance records, security logs, finance office payment records, and security container checks.  See id.  After completing his investigation, Prewitt concluded that DSWA had paid Garcia overtime for hours not worked.  See id. ¶ 15, at 5.

Prewitt issued a Notice of Proposed Suspension to Garcia, informing her that he intended to suspend her for thirty (30) calendar days.  See id.  Garcia responded to the Notice.  See id.  On November 14, 1997, Sedivy, issued a decision to suspend Garcia for thirty (30) calendar days, commencing November 17, 1997, and ending December 16, 1997, for accepting overtime payment for hours not worked and for incorrectly certifying the accuracy of time and attendance records for another employee.  See id.

Garcia alleges that, in 1997, she complained to Air Force Chief EEO Counselor Bettie T. Spencer of her belief that she was being discriminated against because of the investigation by DSWA's agent, Crandley, that targeted her for alleged time card abuse.  See Garcia Aff. ¶ 15, at 4. Spencer was under the direct supervision of the 377 Air Base Wing Commander, Col. Gary D. Dills. See id. ¶ 14, at 3-4.  Prewitt, Sedivy, and Crandley knew of her pre-complaints filed with Spencer from May through December, 1997, and of the subsequent formal complaints that Garcia filed with DSWA's EEO Manager.  See Garcia Aff. ¶ 20, at 5.  Before Garcia informed her immediate supervisor, Prewitt, that she had complained to Spencer, Prewitt assured Garcia that the most he would do, if the time card abuse allegations were true, would be to give her a letter of counseling and keep it himself for 120 days.  See Garcia Aff. ¶ 16, at 4.  After Garcia complained of discrimination to Spencer and Prewitt, Prewitt accused her of receiving unmerited overtime payments for 15.5 hours, in February 1997 and 8 hours on 1 March 1997.  See id. ¶ 17, at 4.  Garcia explained to

Prewitt, Crandley, and Sedivy that she had worked the hours in February, but that DSWA paid her in March as a result of an error that the timekeeper made.  See id. ¶ 18, at 4.  Prewitt refused to allow Garcia, pursuant to regular DSWA practice, to amend her time card to correct the error.  See id. ¶ 19, at 4.

On December 15, 1997, Garcia filed a "mixed case" appeal with the Merit Systems Protection Board ("MSPB"), appealing her suspension.  See Garcia v. Department of Defense, Docket Number DE-0752-98-0116-I-1, Initial Decision at 531 (U.S. MSPB, Denver Field Office, April 9, 1998).  In her "mixed case" appeal, Garcia alleged that DSWA suspended her because of her sex, age, and national origin.  See id. at 532.  An administrative judge held a hearing.  Garcia put on evidence and examined witnesses.  On April 9, 1998, the judge issued his Initial Decision, sustaining the agency's actions, finding that unlawful discrimination did not motivate those actions, and finding no discrimination.  See id. at 531.

Garcia filed a petition for review of the Initial Decision with the full Board.  See Garcia v. Department of Defense, Docket Number DE-0752-98-0116-I-I, Order at 1 (Sept. 30, 1999).  On September 30, 1998, the MSPB issued an Order denying Garcia's petition. See id.  Although Garcia filed an appeal with the United States Court of Appeals for the Federal Circuit appealing the Order, she subsequently withdrew the appeal.  See Deposition of Mary J.C. Garcia at 14 (taken May 21, 2003).

## REMOVAL AS STOCKPILE CHIEF

In 1995, DSWA temporarily promoted Garcia from a Supervising Program Analyst position (GM-13) to a Supervising Computer Specialist position (GM-14), not to exceed May 13, 1997.  See Notification of Personnel Act (Approval Date: 5-15-99).  Before she complained of employment

5

discrimination to Prewitt and Spencer, Prewitt in May 1997 extended her appointment as GM-14 Division Chief for an additional year, not to exceed May 13, 1998, and gave her a cash award based on her outstanding performance as Division Chief. See Notification of Personnel Act (Approval Date: 5-19-97);Garcia Aff. ¶ 22, at 5. DSWA granted Garcia the temporary promotion to allow her to oversee the migration data on the Project. See Prewitt Declaration ¶ 3, at 1-2.

Garcia contends that, despite her success as Division Chief and NUMIS-M Project Manager, in August 1997, Prewitt summarily demoted her to GS-343-13. See Garcia Aff. ¶ 8, at 2-3. On August 6, 1997 -- before he concluded his investigation of Garcia's time and attendance fraud -- Prewitt appointed Commander (Navy) Gerald Brenner as Chief of the Stockpile Control Division, replacing Garcia. See Prewitt Decl. ¶ 10, at 3-4; Garcia Aff. ¶ 8, at 2-3; Garcia Depo. at 97. Garcia contends that Brenner was an inexperienced military officer. See Garcia Aff. ¶ 8, at 2-3.

Brenner's appointment and assignment was part of a planned reorganization that began in January 1997. See id. Prewitt had discussions with Garcia about merging the Stockpile Control Division (FCPC) with the Nuclear Inventory Control Point Division (FCPN). See id. They believed that consolidating the divisions would result in better use of the computer specialist support staff and would prepare the divisions for anticipated downsizing resulting from the early out pay incentive that the agency offered. See id.; Affidavit of Gerald Brenner ¶ 4, at 2 (executed Sept. 6, 2003). Garcia recommended that a military member serve as Division Chief, allowing her to concentrate her efforts on projects such as NUMIS-M. See Prewitt Decl. ¶ 10, at 3-4. The DSWA consolidated the division in August 1997, and Prewitt appointed Brenner as Chief of the combined divisions. See Brenner Aff. ¶ 4, at 2-3. Garcia's temporary promotion ended once DSWA replaced her with Commander Brenner. See Prewitt Decl. ¶ 10, at 3-4.

Prewitt also removed Garcia's supervisory responsibilities based, in part, on the results of the Crandley investigation and report, and because he had received numerous complaints from DSWA employees unhappy with Garcia's leadership style and concerned with her managerial style.  See Prewitt Decl. ¶¶ 11, 12, at 3-4.  Garcia claims that Prewitt and Sedivy stripped away all of her duties and responsibilities and insulted and demeaned her by suggesting that she work as a clerk for the GS-12 DSWA personnel officer.  See  Garcia Aff. ¶ 25, at 5.

The Secretary of the Air Force published an Affirmative Employment Plan.  See Garcia Aff. ¶ 12, at 3.  Hafner approved the Plan.  See id.  Hafner, Prewitt, and Sedivy adopted the Plan.  See id. ¶ 13, at 3.  The Plan showed that Hispanics and females were under-represented in grade levels GM-14.  See id. ¶ 12, at 3.  At the time Prewitt demoted her, Garcia was the only female Hispanic GM-14 and the only female GM-14 manager at DSWA.  See id.

## JOHNSON INVESTIGATION

On September 9, 1997, Sedivy, asked Lt. Col. Larry D. Wrinkle to conduct an inquiry and determine whether there was any truth to the allegations mentioned in Crandley's report that Garcia had retaliated or had threatened to retaliate against DSWA employees providing information to Crandley during his investigation.  See Declaration of Dean G. Sedivy ¶ 6, at 2 (executed June 28, 2003).  After conducting a brief inquiry, Wrinkle provided Sedivy with a memorandum containing his findings and conclusions.  See Wrinkle Memorandum; Sedivy Decl. ¶ 6, at 2.  Wrinkle concluded, among other things, that Garcia, Martinez, and Clark had engaged in retaliatory activities against a number of DSWA employees.  See Sedivy Decl. ¶ 6, at 2.  Specifically, Wrinkle concluded that "reprisals and retaliation activities against FCPC personnel for initiating / cooperating with [Crandley's investigation] did occur . . . The actions of these individuals is especially reprehensible

because of their positions of supervision, leadership and trust."  Wrinkle Memorandum ¶ 7, at 4.  He recommended a downward adjustment of Garcia's grade and that her records should reflect that she left after severe infractions.  See Wrinkle Memorandum at 4.

After receiving the Wrinkle Memorandum, Sedivy contacted Col. Callaway, the DSWA Chief of Staff at headquarters, to discuss the matter.  See Sedivy Decl. ¶ 9, at 2-3.  Wrinkle's findings and conclusions raised very serious concerns.  See id.  After discussing the matter with Callaway, but before taking any action, disciplinary or otherwise, Sedivy concluded that, given the seriousness of the charges, an independent and more through investigation needed to be conducted.  See id.  On November 26, 2997, he then authorized Col. Lonnie Johnson to investigate the matter further.  See id.  Johnson's investigation began in late November 1997 and concluded in early January 1998, after Garcia had decided to retire.  See id.

The Defendant argues that there is no evidence that DSWA took any action against Garcia based on Wrinkle's findings.  See Memorandum in Support of Motion for Summary Judgment ¶ 22, at 9 (citing Sedivy's Decl. ¶ 7,  at 2-3).  Garcia emphasizes that the Defendant has pointed to no other evidence than the Wrinkle Memorandum to show that Sedivy did not, either by acts or omissions, proceed with influence of the Wrinkle report.   Garcia contends that whether the Wrinkle Memorandum influenced Sedivy delves into his state of mind at the time of his actions, making summary judgment inappropriate.

The Defendant argues there is no evidence that Sedivy's decision to authorize the investigation had anything to do with Garcia's race, gender, age, national origin, or prior EEO activities.  See id. ¶ 8, at 3.  Indeed, Sedivy has testified that Garcia's race, gender, age, national origin, and prior EEO activities did not have any impact on his decision to authorize the investigation

8

and on DSWA's actions against Garcia.  See id. ¶¶ 7, 8, at 2-3.  Again, Garcia argues that this contention goes to Sedivy's state of mind and intentions and that summary judgment is thus inappropriate.

## DENIAL OF VSIP APPLICATION

On August 6, 1997, the DSWA Chief of Staff at headquarters issued a memorandum announcing DSWA's plan to offer separation incentives for employees eligible for retirement.  See Prewitt Decl. ¶ 16, at 5.  On October 1, 1997, Garcia submitted her application for $25,000.00 Voluntary Separation Incentive Pay ("VSIP") retirement-incentive bonus.[1]  See Garcia Aff. ¶ 21, at 5.  Prewitt reviewed Garcia's application and, on October 3, 1997, recommended approval of Garcia's VSIP application.  See id. ¶ 16, at 5.

On October 17 and 21, 1997, and on November 13, 1997, the RMC met to consider all DSWA VSIP applications, including Garcia's.  See  Brittigan Decl. ¶ 7, at 2.  At each meeting, the RMC deferred action on Garcia's application because of the investigation into allegations that she had retaliated or had threatened to retaliate against military and civilian personnel for cooperating in an official DOD IG investigation.  See id.  Of the 30 employees who applied for VERA or VSIP, three -- Garcia, Martinez, and Gary Rear -- were undergoing investigation or had pending adverse actions

---

[1] In the early 1990s, the Department of Defense ("DOD") began slowly downsizing at a rate of approximately 5 - 10% per year as a result of budgetary constraints.  See Declaration of Robert L. Brittigan ¶ 3, at 1 (executed June 27, 2003).  Although it hoped to reach its goal of a reduced labor force through attrition, the DOD realized that monetary incentives were necessary to accomplish the desired result, and in late 1997, DSWA offered an "early out" program for civilian employees.  See id.  Eligible employees could apply for voluntary early retirement ("VERA") or voluntary separation incentive pay ("VSIP").  See id. ¶ 4, at 1.  DSWA's Resource Management Committee processed all VERA and VSIP applications, with management reserving the right to deny any application for legitimate business reasons.  See id.  The program required that all employees approved for either VERA or VSIP to be off the rolls by December 3, 1997.  See id.

against them. <u>See id.</u> ¶ 6, at 2.

The RMC discussed the issue and decided that it would be inappropriate to pay separation bonuses to such personnel. <u>See id.</u> The RMC also decided that, if DSWA concluded the investigations and/or adverse actions (including the service of any periods of suspension) on or before December 3, 1997, it would consider the employees eligible and include the service of any periods of suspension. <u>See id.</u> Rear served his suspension before December 3, 1997, and the RMC eventually approved his VSIP application. <u>See id.</u> ¶ 9, at 3.

By November 19, 1997, the results of the preliminary investigation were available, and the RMC received the Wrinkle Memorandum. <u>See</u> Brittigan Decl. ¶ 8, at 2-3. Wrinkle concluded that there was evidence to support the charges against Garcia. <u>See id.</u> Field Command then asked Headquarters to conduct an in-depth investigation into the matter. <u>See id.</u> It was clear to the RMC that DSWA would not complete its investigation before December 3, 1997. <u>See id.</u> ¶ 8, at 2-3. Accordingly, the RMC denied Garcia's VSIP application. <u>See id.</u> The RMC also denied the application because of the charges against her -- charges that the DOD did not take lightly. <u>See id.</u> The RMC knew that, if the in-depth investigation confirmed Wrinkle's findings, DSWA would, in all likelihood, remove Garcia from her position. <u>See id.</u> The RMC felt it would be inappropriate to make a retirement incentive payment to an employee whom DSWA might remove for misconduct. <u>See id.</u>

The Defendant maintains that Garcia's VSIP application was denied for reasons having nothing to do with her gender, race, age, national origin, or prior EEO activities. The RMC denied the application because all approved VSIP applicants needed to be off the rolls by December 3, 1997, and the in-depth investigation that Johnson was conducting would not be completed by that date. <u>See</u> Brittigan Decl. ¶ 8, at 2-3. The RMC also denied Garcia's application because of the seriousness

of the charges against her, charges warranting her removal if sustained.  See id.  Moreover, there is

no evidence that Garcia's race/national origin, age, or prior EEO activities motivated the RMC's

decision to deny Garcia's VSIP application.  See id. ¶ 10, at 3.  Moreover, Robert Brittigan, a

member of the RMC in 1997, states that RMC did not base any of its decisions regarding Garcia's

denial of VSIP on her race, sex, age, or prior EEO activities.  See id. ¶ 10, at 3.  Of the twenty-one

VSIP applications that the RMC approved, Hispanic employees submitted eleven.   See id.

Nevertheless, Garcia attempts to dispute these contentions by stating that they go to the state of mind

and intentions of all persons responsible for making the decisions regarding VSIP applications.

Prewitt informed Garcia that RMC had denied her VSIP application on December 22, 1997,

the day she returned to work after serving her suspension.  See Request for Personnel Action (signed

December 23, 1997).  The following day she decided to retire.  See id.

## DENIAL OF REQUEST FOR RESTORATION OF LEAVE

On or about December 22, 1997, Garcia asked Prewitt to approve her request to restore

annual leave that she believed she would forfeit at the end of the leave year.  See Prewitt Decl. ¶ 18,

at 6.  Prewitt denied her request for the following reasons.  See id.  First, Garcia's request was

premature.  See id.  The regulations governing the restoration of leave require that the employee

submit requests after he or she has forfeited the leave.  See id.

Second, the facts and circumstances surrounding her request did not warrant approval.  See

id.  The regulations entitle an employer to restore leave when an employee has requested the use of

annual leave and the agency has approved that annual leave, but, because of the agency's exigencies

or because of the employee's sickness, the annual leave was subsequently canceled.  See id.  In 1997,

the demand of her job or sickness did not prevent Garcia from using annual leave that she had

11

requested and that DSWA had approved.  See id.

Third, DSWA denied Garcia's request for budgetary reasons.  See id.  Prewitt was told in mid-1997 that the agency was tight on funds because of the amount of overtime spent on migrating the data and that, unless a request strictly complied with the regulations, the agency should deny the request.  See id.

There is no evidence that DSWA denied her request because of her age, gender, national origin, or prior EEO activities.  See id.  Moreover, Prewitt has testified that his denial of Garcia's request had nothing to do with her age, gender, national origin, or prior EEO activities.  See id. ¶ 18, at 6.  Again, Garcia contends that these statements are conclusions, and go to the state of mind and to the intentions of all persons responsible for making the decisions regarding Garcia's request.

Prewitt informed her that he was denying her request for restored leave on December 22, 1997, the day she returned to work after she served her suspension.  See Request for Personnel Action (signed December 23, 1997).  The following day, she decided to retire.  See id.

## CONSTRUCTIVE DISCHARGE

Garcia contends that Prewitt and Navy Commander Bruno made open derogatory comments in front of Garcia, saying that Garcia was old, and that her deputy, Mr. Alfredo Martinez, was old and should retire.  See Garcia Aff. ¶ 7, at 2.  Before CDR Bruno left, he threatened Garcia by saying that he would dig up "dirt" on her.  See id. ¶ 10, at 3.  Bruno retired in 1995.  See Garcia Depo. at 146.  And the alleged co-worker harassment described in paragraphs 53, 54, 56, 57, and 58 of Garcia's Complaint occurred before June 1997.  See Garcia Depo. at 12-124.

In August 1997, shortly after Prewitt replaced her with Brenner, Garcia requested that DSWA allow her to take sick leave.  See Garcia Depo. at 92-93.  Prewitt approved Garcia's request.  See

id.  Between August 16, 1997 and December 19, 1997, Garcia worked a total of 28 hours.  See Calendar for August-December 1997, and January 1998.  Between August 16, 1997 and December 19, 1997, Garcia used 420 hours of sick leave.  See id.  Between August 16, 1997 and December 19, 1997, Garcia was not ill or incapacitated, and did not suffer from any condition preventing her from working.  See Garcia Depo. at 97-98.

Prewitt suspended Garcia in November 1997.  See Garcia Aff. ¶ 9, at 3.  Garcia served her suspension between November 17, 1997 and December 16, 1997.  See Prewitt Decl. ¶ 15, at 5.  On December 22, 1997, Prewitt informed Garcia that she had been denied her VSIP application and request for restored leave.  See Request for Personnel Action (signed December 23, 1997).  After serving her suspension, Garcia returned to work.  See Garcia Depo. at 239-40.  On December 22, 1997, Garcia asked Prewitt whether she could return to her office in the stockpile control division.  See Deposition of Garcia at 16 (taken November 15, 1999).  Prewitt denied Garcia's request, stating that he intended to place her elsewhere.  See id.

Upon her return, Prewitt told her to sit in the Secretary's office, with nothing to do.  See Garcia Aff. ¶ 9, at 3.  Prewitt removed all duties and responsibilities from Garcia and gave them to Brenner, an Anglo.  See id. ¶ 11, at 3.  Following her discrimination complaint to Prewitt and Spencer, Prewitt and Sedivy excluded Garcia from staff meetings and avoided her.  See Garcia Aff. ¶ 23, at 5.

Garcia alleges that, as a result of a report that Major Joyce Washington issued, she was denied access to Top Secret information that she needed to do her job.  See Garcia Aff. ¶ 24, at 5.  Garcia contends that she was not give the opportunity to defend against the allegations.  See id.  Garcia denies the allegations in Washington's report.  See id.  The Defendant argues that DSWA did not

13

deny Garcia access to the NUMIS-M work space after Brenner replaced her, nor did DSWA suspend or revoke her security clearance.  See Prewitt Decl. ¶ 14, at 5.  After Garcia was removed from the Project, her access to the TOP SECRET work was restricted because DSWA strictly restricts access to this area on a need to know basis.  See Affidavit of Gerard F. Brenner ¶ 7, at 3 (executed September 6, 2000).

On December 22, 1997, Garcia executed a Request for Personnel Action ("RPA") requesting optional retirement and her request was authorized the next day.  See Request for Personnel Action (signed December 23, 1997).  In the RPA, Garcia stated that she was retiring because Prewitt had informed her that she had been denied her VSIP application.  See id.  Garcia now contends that, as a reasonable person, she felt that she had no other alternative but to submit her involuntary resignation or retirement.   See Garcia Aff. ¶ 26, at 6.  Garcia's retirement became effective on January 3, 1998.  See Complaint ¶ 63, at 12; Garcia Aff. ¶ 26, at 6.  Garcia then made a pre-complaint to Counselor Spencer and formal complaint to the DSWA EEO Manager.  See Garcia Aff. ¶ 26, at 6.

## EEO COMPLAINT

On May 4, 1998, Garcia filed an EEO complaint with DSWA.  The Defendant asserts that the agency acknowledged receipt of the complaint and informed Garcia that it had accepted the following issues for investigation and processing:

> Was the plaintiff discriminated against based on her race (Hispanic), National Origin (Hispanic), age (57), sex (female), and reprisal (prior protected activity) when: (a) She was subjected to an investigation by Col. Johnson on November 26, 1997 . . .";
> (b) On December 23, 1997, she was denied her request for VSIP (early-out incentive); (c) On December 23, 1997, her request to restore annual leave was denied;
> (d) She alleges constructive discharge as a result of alleged disparate treatment and alleged hostile work environment . . . ; (e) She was removed as a GS-14 Division

14

Chief and reduced back to a GS-13 Program Manager, removed from authority, and relegated to a position without duties.

While the EEO complaint is not before the Court as a part of the record, the Defendant quoted this portion of the complaint in Defendant's Memorandum in Support of Motion for Summary Judgment and Garcia did not challenge the quote in her Response or at the hearing.

## STANDARDS FOR DECIDING MOTIONS FOR SUMMARY JUDGMENT

When reviewing a motion for summary judgment, the Court should keep in mind three principles that the Supreme Court of the United States has set forth.  The first of these principles is that it is not the Court's role to weigh evidence; the Court's role is only to assess the threshold issue whether a genuine issue exists as to material facts requiring a trial.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1980).  The second principle is that the Court must resolve all reasonable inferences and doubts in favor of the non-moving party, and construe all evidence in the light most favorable to the non-moving party.  See Hunt v. Cromartie, 526 U.S. 541, 550-55 (1999).  Third, the Court cannot decide any issues of credibility in a summary judgment motion.  See Anderson v. Liberty Lobby, Inc., 477 U.S. at 255.

In addition, multiple circuits have ruled that, in addition to these standards that the Supreme Court has set, facts that are related to the state of mind of a party do not lend themselves to summary judgment.  In cases that involve delving into the state of mind of a party, the granting of summary judgment is especially questionable.  See, e.g., LeFevre v. Space Communications Co. (Spacecom), 771 F.2d 421, 423 (10th Cir. 1985)("'State of mind ... is difficult to prove and great circumspection is required where summary judgment is sought on an issue involving state of mind.'")(quoting Hahn v. Sargent, 523 F.2d 461, 468 (1st Cir.1975), cert. denied, 425 U.S. 904 (1976) (citations omitted))).

15

"If plaintiffs claim that some conduct on the part of defendant abridged their First Amendment rights, summary judgment may be precluded because questions concerning defendant's motives or knowledge must be determined."   10B C. Wright, A. Miller & M. Kane, <u>Federal Practice & Procedure</u> § 2732.2, at 153-54, 177 (3d ed. 1998). <u>See</u> <u>Seamons v. Snow</u>, 206 F.3d 1021, 1026 (10th Cir. 2000)("It is axiomatic that a judge may not evaluate the credibility of witnesses in deciding a motion for summary judgment."); <u>Geier v. Medtronic, Inc.</u>, 99 F.3d 238, 240 (7th Cir. 1996)("We apply the summary judgment standard with especial scrutiny to employment discrimination cases, . . . which often turn on the issues of intent or credibility."); <u>Sample v. Aldi Inc.</u>, 61 F.3d 544, 547 (7th Cir. 1995)("[The summary judgment] standard is applied with added rigor in employment discrimination cases, where intent and credibility are crucial issues.")(internal quotation marks and citation omitted).

Where material facts are not in dispute, summary judgment is appropriate.  Conversely, where there is substantial dispute as to material facts in a case, the Court cannot grant summary judgment. <u>See</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1980)("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.  Factual disputes that are irrelevant or unnecessary will not be counted.").

## **APPLICABLE LAW**

### **A.    THE ELEMENTS OF EACH CLAIM OF DISCRIMINATION.**

#### **1.    Gender, Race/National Origin Discrimination.**

While the United States Court of Appeals for the Tenth Circuit's specific articulations of a Title VII prima facie case more often relate to failure to hire, failure to promote and discriminatory discharge claims – rather than a general disparate treatment based on race, gender or national origin

discrimination – the Tenth Circuit has generally required a Title VII plaintiff to establish three things: (i) that she is a member of a protected class; (ii) that she suffered some adverse employment action; and (iii) that the two are causally related.  See, e.g., Kendrick v. Penske Transp. Servs., Inc., 220 F.3d 1220, 1227, n. 6 (10th Cir. 2000)("The critical prima facie inquiry in all cases is whether the plaintiff has demonstrated that the adverse action occurred 'under circumstances which give rise to an inference of unlawful discrimination.' . . . Collapsing the four-part prima facie case of McDonnell Douglas into a three-part test may occasionally be helpful when addressing discrimination claims that either do not fall into any of the traditional categories (e.g., hiring or discharge) or present unusual circumstances.")(quoting Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 253 (1981)). Garcia must, therefore, show that (i) she is a member of a protected class; (ii) DSWA's employment decisions with regard to Garcia amount to adverse employment actions; and (iii) there is a causal connection between the two.

<strong>2.      Retaliation.</strong>

Title VII prohibits retaliation against employees for opposing any practice that Title VII makes unlawful or for asserting a charge, testifying, assisting or participating in any manner in an investigation, proceeding, or hearing under Title VII.  See Gunnell v. Utah Valley State Coll., 152 F.3d 1253, 1262 (10th Cir. 1998).  To establish a prima facie case of retaliation, Garcia must show that:  (i) she engaged in an activity that Title VII protects; (ii) that the employer took an adverse employment action against her subsequent to her protected activity; and (iii) there was a causal connection between her participation in the protected activity and the adverse employment action that the employer took.  See id.  The Tenth Circuit has recently articulated the plaintiff's burden in establishing the causal connection element of the prima facie case:  "Plaintiff can establish the

17

requisite causal connection by producing 'evidence of circumstances that justify an inference of retaliation motive, such as protected conduct closely followed by adverse action.'"  Adams v. Washington University of Topeka, 66 Fed. Appx. 819-821-22, 2003 WL 21290924 (10th Cir. 1982)). "[U]nless the [adverse action] is very closely connected in time to the protected activity, the plaintiff must rely on additional evidence beyond temporal proximity to establish causation."  Anderson v. Coors Brewing Co., 181 F.3d 1171, 1179 (10th Cir. 1999)(emphasis in original).

### 3.  Age Discrimination.

Under the Age Discrimination in Employment Act ("ADEA"), it is "unlawful for an employer . . . to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age."  29 U.S.C. § 623(a)(1).  A plaintiff alleging disparate treatment under the Act must show that age made the difference in the employer's decision.  See Greene v. Safeway Stores, Inc., 98 F.3d 554, 557 (10th Cir. 1996).  Garcia need not prove that age was the sole reason for the employer's acts, but she must show that age made the difference in the employer's decision. See id.

To establish a prima facie case of age discrimination, Garcia must show that: (i) she is within the protected age group; (ii) she was doing satisfactory work; (iii) DSWA discharged her or she suffered some adverse employment action; and (iv) a younger person replaced her.  See id.; Cone v. Longmont United Hosp. Ass'n, 14 F.3d 526, 529 (10th Cir. 1994).

### 4.  McDonnell Douglas Analysis.

In the absence of direct evidence, claims of age, race, national origin, gender discrimination, and retaliation are all subject to the burden shifting framework that the Supreme Court established

in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-804 (1973).  See Pastran v. K-Mart Corp.,

210 F.3d 1201, 1205 (10th Cir. 2000)(noting that retaliation claims are subject to the burden shifting

analysis under McDonnell Douglas); Munoz v. St. Mary-Corwin Hospital, 221 F.3d 1160,  1165-67

(10th Cir. 2000)(holding that court must analyze claims of age discrimination under the ADEA and

discrimination under Title VII under the analysis that the Supreme Court established in McDonnell

Douglas).  Under McDonnell Douglas, the establishment of a prima facie case of discrimination

creates a presumption that the employer unlawfully discriminated or retaliated against the employee.

See St. Mary's Honor Center v. Hicks, 509 U.S. 502, 506 (1993).  This presumption places upon the

defendant the burden of producing an explanation to rebut the prima facie case.  See id. at 506-507.

This burden is one of production, not persuasion.  See Reeves v. Sanderson Plumbing Prods., Inc.,

530 U.S. 133, 142 (2000).

To meet its burden, the defendant need only articulate a facially nondiscriminatory reason for

its actions.  The defendant is not obligated to litigate the merits of its reasoning nor does it need to

prove that the reasons it relied upon were bona fide.  See Panis v. Mission Hills Bank, N.A., 60 F.3d

1486, 1491 (10th Cir. 1995), cert. denied, 516 U.S. 1160 (1996); EEOC v. Flasher Co., 986 F.2d

1312, 1316 (10th Cir. 1992).  Once the defendant has met its burden, the presumption of unlawful

discrimination drops from the case.  See St. Mary's Honor Center v. Hicks, 509 U.S. at 506.

After the defendant has met its burden of producing an explanation, the plaintiff bears the

ultimate burden of persuading the trier of fact that the defendant unlawfully discriminated or retaliated

against her.  The plaintiff discharges that burden directly by proving that the defendant acted with

discriminatory motive or indirectly by showing that the stated reason for its action was a pretext, i.e.,

the  facially  nondiscriminatory  reason  was  a  cover-up  for  a  decision  motivated  by  unlawful

19

discrimination.  See EEOC v. Flasher Co., 986 F.2d at 1316.  "Pretext can be shown by such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact finder could rationally find them unworthy of credence and thence infer that the employer did not act for the asserted non-discriminatory reasons."  Morgan v. Hilti, 108 F.3d 1319, 1323 (10th Cir. 1997)(citing Olson v. General Electric Astrospace, 101 F.3d 947, 951-52 (3d Cir. 1996)).

There is a new legal standard for so-called "mixed motive" cases, where both legitimate and illegitimate motives may play a role in key employer decisions.  In the newly decided case of Desert Palace, Inc. v. Costa, 123 S.Ct. 2148 (2003), the Supreme Court of the United States established that plaintiffs in "mixed motive" Title VII cases need not produce direct evidence of discriminatory motive.  In Desert Palace, the employee presented evidence that: (i) a supervisor stalked her; (ii) she received harsher discipline than men; (iii) her employer treated her less favorably than men in the assignment of overtime; and (iv) supervisors stacked her disciplinary record and used or tolerated sex-based slurs against her.  The district court gave the jury a mixed-motive instruction and rejected the employer's objection, which contended that the employee had failed to adduce "direct evidence" that sex was a motivating factor in her dismissal.  The Supreme Court determined that the district court did not abuse its discretion in giving a mixed motive instruction to the jury.  The Supreme Court noted "the utility of circumstantial evidence in discrimination cases" and stated that circumstantial evidence "is not only sufficient, but may also be more certain, satisfying and persuasive than direct evidence."  See id. 123 S.Ct. at 2154.  The Court found this particularly true in the case where the facts surrounding the incident were disputed.  See id.; Campbell v. Wal-Mart Stores, Inc., 272 F. Supp. 2d 1276, 1300 (N.D. Okla. July 21, 2003).

### B.    CONSTRUCTIVE DISCHARGE

A constructive discharge occurs when an employer, through its illegal discriminatory acts, makes working conditions so difficult that a reasonable person in the employee's position would feel compelled to resign.  See Sanchez v. Denver Pub. Sch., 164 F.3d 527, 533 (10th Cir. 1998); Derr v. Gulf Oil Corp., 796 F.2d 340, 344 (10th Cir. 1986).  "If an employee resigns of her own free will, even as a result of the employer's actions, that employee will not be held to have been constructively discharged."  Jeffries v. State of Kansas, 147 F.3d 1220, 1233 (10th Cir. 1998).  To establish a claim of constructive discharge, the plaintiff must essentially show that he had no choice other than resignation.  See Garrett v. Hewlett-Packard Co., 305 F.3d 1210, 1221 (10th Cir. 2002)("The bar is quite high in such cases: a plaintiff must show he had no other choice but to quit."); Yearous v. Niobara County Mem'l Hosp., 128 F.3d 1351, 1356 (10th Cir. 1997)("Constructive discharge occurs when a reasonable person in the employee's position would view the working conditions as intolerable. That is to say the working conditions, when viewed objectively, must be so difficult that a reasonable person would feel compelled to resign."); Schaulis v. CTB/McGraw-Hill, Inc., 496 F. Supp. 666, 676 (N.D. Cal. 1980)("An employer has not effected a constructive discharge merely because an employee believes that she has lost respect or credibility within the company or that she has limited opportunities for advancement.") .  In other words, the employment conditions must be objectively intolerable.  See Sanchez v. Denver Pub. Sch., 164 F.3d at 533.

The plaintiff's subjective views of the situation are irrelevant.  See id.  In addition, a majority of the Circuits, including the Tenth, require that the alleged acts of discrimination be accompanied by aggravating circumstances, i.e., the plaintiff must make a showing of something more than garden-variety acts of discrimination.  See James v. Sears Roebuck & Co., 21 F.3d 989, 992 (10th Cir.

1994)(holding that a court must not base a finding of constructive discharge only on the discriminatory act and that there must also be aggravating factors that make staying on the job intolerable); Irving v. Dubuque Packing Co., 689 F.2d 170, 172 (10th Cir. 1982).

Moreover, in cases involving alleged constructive discharge, the general rule is that a reasonable employee must remain and fight discrimination on the job. In fact, there is a presumption that, unless the situation becomes intolerable, it is preferable for the employee to seek redress within the context of the employment relationship. See Derr v. Gulf Oil Co., 796 F.2d 340, 342-43 (10th Cir. 1986)("We agree with the Fifth Circuit's statement in Bourque [v. Powell Elec. Mfg. Co., 617 F.2d 61, 66 (5th Cir. 1980)] that 'society and the policies underlying Title VII will be best served if, wherever possible, unlawful discrimination is attacked within the context of existing employment relationships.'"); Perry v. Harris Chernin, Inc., 126 F.3d 1010, 1015 (7th Cir. 1997)("[U]nless conditions are beyond 'ordinary' discrimination, a complaining employee is expected to remain on the job while seeking redress."); Garner v. Wal-Mart Stores, Inc., 807 F.2d 1536, 1539 (11th Cir. 1987) (holding that employee has duty to inform higher management and use available grievance procedures, including the EEOC). The obligation to seek redress is particularly true given the statutory protections from discrimination and retaliation that Title VII and other statutes afford. See Derr v. Gulf Oil Corp., 796 F.2d at 344 (10th Cir. 1996); Bourque v. Powell Elec. Mfg. Co., 617 F.2d at 66.

Garcia appears to be arguing that DSWA constructively discharged her because it created or tolerated a hostile work environment. The Supreme Court of the United States has held that hostile work environment claims are different in kind from discrete acts. See National R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 115 (2002). Because their very nature involves repeated conduct, the

"unlawful employment practice," § 2000e-5(e)(1), cannot be said to occur on any particular day.  Id.

It occurs over a series of days or perhaps years and, in contrast to discrete acts, a single act of

harassment may not be actionable on its face.  See id. (citing Harris v. Forklift Systems, Inc., 510

U.S. 17, 21 (1993)).  Determining whether an actionable hostile environment claim exists requires

an examination of all the circumstances, including the frequency of the discriminatory conduct; its

severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and

whether it unreasonably interferes with an employee's work performance.  See National Railroad

Passenger Corp. v. Morgan, 536 U.S. at 115 (citing Harris v. Forklift Systems, Inc., 510 U.S. at 23).

The question whether a court may, for purposes of determining liability, review all such conduct,

including those acts that occur outside the filing period, turns on the statutory requirement that a

charge be filed within a certain number of days "after the alleged unlawful employment practice

occurred."  National Railroad Passenger Corp. v. Morgan, 536 U.S. at 116-117.  Because such a

claim is composed of a series of separate acts that collectively constitute one "unlawful employment

practice," it does not matter that some of the component acts fall outside the statutory time period.

Id. at 117.  Provided that an act contributing to the claim occurs within the filing period, the court

may consider the entire time period of the hostile environment for the purposes of determining

liability.  See id.  That act need not be the last act.  Subsequent events may still be part of the claim,

and an employee may file a charge at a later date and still encompass the whole.  See id.  Therefore,

a court's task is to determine whether the acts about which an employee complains are part of the

same actionable hostile work environment practice, and if so, whether any act falls within the

statutory time period.

**LEGAL ANALYSIS AND DISCUSSION**

The essence of Garcia's case is that DSWA exposed her to a hostile work environment, discriminatorily denied her an early retirement "VSIP" package, and then constructively discharged her from her employment.  Garcia attributes to the Defendant's responsible management officials unlawful motives: (i) retaliation for EEO activity; and (ii) discrimination based on age (57), gender (female), and national origin (Hispanic).  Garcia contends that the mechanisms by which she suffered discrimination and retaliation at the hands of the responsible management officials include several "investigations" of her conduct, ranging from accusations of receiving unearned overtime pay to accusations of "retaliating" against subordinates for participating in the investigations.  Garcia complains that Prewitt stripped her of her job duties, denied security access that her work required, denied an "early retirement" option, and forced her into retirement, i.e., constructively discharged her. The Defendant counters with multiple neutral, non-discriminatory reasons for its actions.   Thus, the Court's task is to determine: (i) whether Garcia has shown a genuine issue of material fact regarding the prima facie elements of her claims; and (ii) if she has, whether she has also shown that there is a genuine issue of material fact regarding pretext.

**I.     THERE ARE NO GENUINE ISSUES OR DISPUTES REGARDING MATERIAL FACTS.**

Garcia admits all of the Defendant's undisputed  material facts with the exception of four. As to these four, Garcia does not do what she must to create factual disputes.  Under local rule 56, it is not enough for the non-moving party to argue that a fact is in dispute.  Local rule 56.1(b) provides:

> A memorandum in opposition to the motion must contain a concise statement of the
> material facts as to which the party contends a genuine issue does exist.  Each fact in

dispute must be numbered, must refer with particularity to those portions of the record upon which the opposing party relies, and must state the number of the movant's fact that is disputed. All material facts set forth in the statement of the movant will be deemed admitted unless specifically controverted.

Hence, for purposes of this motion, there are no genuine issues of material fact.

## II.   DEFENDANT IS ENTITLED TO SUMMARY JUDGMENT ON GARCIA'S DISCRIMINATION CLAIMS.

The Defendant does not dispute that Garcia is in protected classes for national origin, gender, and age. Garcia alleges that she was the victim of gender, race/national origin, and age discrimination and retaliation when: (i) Johnson investigated her; (ii) the RMC denied her VSIP application; (iii) Prewitt denied her request to restore annual leave; and (iv) Prewitt removed her as Stockpile Chief in August, 1997. The Defendant is entitled to summary judgment on all claims for the reasons set forth below.

### A.   WRINKLE AND JOHNSON INVESTIGATIONS.[2]

The Defendant is entitled to summary judgment on this claim for two reasons. First, the investigation does not constitute an adverse employment action, an essential element of Garcia's claim of discrimination. Second, Garcia has not presented any evidence indicating that the Defendant's

---

[2] The Defendant asserts that Garcia's formal EEO complaint explicitly listed only the Johnson investigation as a potential adverse action, although three investigations actually occurred: Crandley's, Wrinkle's and Johnson's. Garcia may be attempting to assert some or all of them as independent bases for finding discrimination and /or retaliation. Callaway directed Crandley to conduct an initial investigation into the allegations of time card abuse. Subsequently, Sedivy asked Wrinkle to investigate the truth of allegations that Garcia had retaliated against individuals who cooperated with Crandley in his initial investigation. Crandley found evidence substantiating the time card abuse allegations against Garcia, and Wrinkle concluded that Garcia had retaliated against a number of employees. Based on these results, Sedivy tasked Johnson with conducting a more in depth, independent investigation. To the extent that Garcia attempts to bring these two initial investigations before the Court, the Court's analysis of the Johnson investigation applies to the Crandley and Wrinkle investigations.

explanation for authorizing the investigation is pretextual.

### 1.      No Adverse Employment Action.

The primary issue for the retaliation and discrimination claims is whether Garcia suffered an adverse employment action. The Tenth Circuit liberally defines "adverse employment action." Garcia contends that the fact of the Wrinkle and Johnson investigations is sufficient to meet the Tenth Circuit's standard for adverse actions.

Johnson's appointment to investigate co-worker claims of reprisal does not constitute an adverse employment action, an essential element of any claim of discrimination, as the Tenth Circuit has defined that term.  As stated previously, the Tenth Circuit employs a liberal, case-by-case approach to determining whether acts complained of by an employee constitute "adverse employment actions" for purposes of Title VII analysis.  See Gunnell v. Utah Valley State Coll., 152 F.3d 1253, 1264 (10th Cir. 1998).  Guiding this case-by-case analysis is the general principle that an adverse employment action is one that "alters the employee's compensation, terms, conditions, or privileges of employment, or adversely affects his or her status as an employee." Heno v. Sprint/United Mgmt., Co., 208 F.3d 847, 857 (10th Cir. 2000)(internal quotation marks and citations omitted).

The Tenth Circuit has repeatedly stated that Title VII does not make actionable ordinary workplace tribulations.  See Sanchez v. Denver Pub. Sch., 164 F.3d at 532.  Conduct is only adverse if it results in a significant change in employment status, or alters the employee's compensation, terms, conditions, or privileges of employment.  See id. at 531.  Johnson's investigation is not an adverse employment action because it did not affect Garcia's employment status.

As the Tenth Circuit recently noted in Wells v. Colorado Department of Transportation, 325 F.3d 1205 (10th Cir. 2003), for an action to be adverse, it must be "materially adverse to the

employee's job status."  See id. at 1213 (emphasis added).  The action must result in a significant

change in employment status or alter the employee's compensation, terms, conditions, or privileges

of employment.  See Aquilino v. University of Kansas, 268 F.3d 930, 934 (10th Cir. 2001)(noting

that adverse action must be a significant change in employment status, such as firing, failing to

promote, reassignment with significantly different responsibilities, or a decision causing a significant

change in benefits); Sanchez v. Denver Pub. Sch., 164 F.3d 527, 532 (10th Cir. 1998)("[W]e will not

consider a mere inconvenience or an alteration of job responsibilities to be an adverse employment

action.")(internal quotation marks and citation omitted).

Garcia contends that the Defendant subjected her to repeated investigations culminating in

her being relieved of virtually all of her job duties, access to work space, and her security access.

Relying on Wells v. Colorado Department of Transportation, she contends it is the "sum total" of the

Defendant's activities that was "materially adverse to her job status."  While there is no dispute that

some of the other of the Defendant's activities were adverse employment actions, the Court cannot

reach that conclusion on Johnson's investigation.  Johnson's investigation began in late November

1997, while Garcia was serving her 30-day suspension; he concluded his investigation in early January

1998, after Garcia retired.  Consequently, the investigation had no impact on the terms or conditions

of Garcia's employment.  DSWA did not discipline her, nor did she lose any pay or related benefits.

Nothing adverse occurred.

Courts within this circuit and elsewhere have held that neither investigations nor the emotional

anxiety or inconvenience resulting therefrom are adverse employment actions or fall within the Act's

purview.  See Rider v. Town of Farmington, 162 F. Supp. 2d 45, 53 (D. Conn. 2001) (holding that

initiation of investigation of female police officer's actions was not an adverse employment action

27

absent evidence that officer suffered material adverse change in terms and conditions of employment); Cancel de Rugg v. West, 106 F. Supp. 2d 289, 298 (D.P.R. 2000)(finding investigation of charges of sexual harassment against the plaintiff was not an adverse employment action); Watson v. Lucent Technologies, Inc., 92 F. Supp. 2d 1129, 1134 (D. Kan. 2000) (holding that investigation of the plaintiff's absences, even for retaliatory reasons, was not an adverse employment action); Settle v. Baltimore County, 34 F. Supp. 2d 969, 992 (D. Md. 1999) (holding that, if a disciplinary investigation is reasonably rooted in articulable facts justifying the investigation, neither inconvenience nor emotional anxiety on the employee's part will constitute an "employment injury" sufficient to render the investigation an adverse employment action); Fortner v. State of Kansas, 934 F. Supp. 1252, 1267 (D. Kan. 1996)(holding that supervisor's appointment of someone to investigate the plaintiff's vehicle accident did not amount to an adverse employment action).

Hence, the investigations do not constitute adverse employment actions as a matter of law. Also, as a factual matter, Garcia has not shown that anything adverse happened to her as a result of the investigations.  Garcia has failed to establish a prima facie case of discrimination or retaliation.

## 2.   No Evidence of Pretext.

Not only are the investigations not adverse employment actions, but Garcia has not produced evidence demonstrating pretext.  In her 16-page Response, Garcia devotes two pages to argument. Those two pages, however, do not contain argument about pretext.

As previously noted, Garcia's discrimination and retaliation claims are all subject to the burden shifting framework that the Supreme Court established in McDonnell Douglas Corp. v. Green. The Defendant has articulated legitimate nondiscriminatory reasons for DSWA's actions. Specifically, the Defendant has articulated a legitimate, non-discriminatory explanation why it

authorized the Johnson investigation.

In her response, Garcia admits that the Defendant has articulated legitimate, non-discriminatory explanations for all its actions.  <u>See</u> Response at 14.  At this juncture, this Court must consider whether Garcia has demonstrated that the Defendant's asserted reasons for the investigations are pretextual, by pointing to weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the Defendant's explanation, allowing a reasonable fact finder to conclude that the reasons are unworthy of belief and to infer that the Defendant did not act for the asserted non-discriminatory reasons.  <u>See</u> <u>Morgan v. Hilti</u>, 108 F.3d at 1323 (citing <u>Olson v. General Electric</u> <u>Astrospace</u>, 101 F.3d 947, 951-52 (3d Cir. 1996)).  At the conclusion of his investigation, Crandley recommended that DSWA conduct an inquiry to determine whether Garcia had threatened or retaliated  against DSWA employees providing information to him.  Wrinkle conducted that inquiry and concluded that Garcia had "engaged in a totally groundless personal attack against the character, judgment, and security clearances of several individuals since the onset of the IG investigation." Wrinkle Memorandum at 2.  Wrinkle recommended a downward adjustment of Garcia's grade and that RMC deny her application for VSIP.  Sedivy then appointed Johnson to investigate the matter further.

Sedivy's decision to authorize the investigation does not have anything to do with Garcia's age, race/national origin, gender, or prior EEO activities.  Sedivy authorized the investigation because Wrinkle's findings and conclusions raised serious and disturbing issues regarding Garcia's judgment and behavior.  Sedivy believed that, to be fair to Garcia, DSWA needed to conduct  an independent and more thorough investigation before taking any action, whether disciplinary or otherwise.  Garcia has not pointed to any facts controverting Sedivy's explanation.

Although Garcia disputes the Defendant's contention that no actions against Garcia were taken based on Wrinkle's findings, she fails to specifically controvert that fact by referring to that portion of the record supporting her contention, as local rule 56.1(b) requires. See D.N.M. LR-Civ. 56.1(b). As such, the Court must deem admitted the Defendant's contention that no actions against Garcia were taken based on Wrinkle's findings.

Garcia argues that the Defendant's statement that Sedivy's decision to authorize the investigation had nothing to with her race, gender, age national origin or prior EEO activities is not a statement of fact, but an opinion. The Court disagrees. The statement is factual, and the Court must deem it admitted based on Garcia's failure to specifically controvert the fact as local rule 56 requires. But even if the Defendant's statement were opinion, and the Court did not need to consider it in determining whether summary judgment is appropriate, it would be, on the record before the Court, the Court's opinion too. There is no contrary evidence.

Rather than presenting evidence, Garcia argues that she was the victim of discrimination, that the Defendant has articulated neutral, non-discriminatory reasons for its actions, that she engaged in activities that Title VII protects, and that the only issue for this Court to resolve is whether she suffered adverse employment actions. She also suggests that this might be a "mixed motive" case and that "state of mind" is the key to determining whether Garcia was the victim of discrimination. There is nothing in her Response or affidavit, however, suggesting that DSWA conducted the Johnson investigation for reasons other than those reasons that DSWA stated. Garcia's failure to present evidence of pretext is fatal to her claim. See Wells v. Colorado Dep't. of Transp., 325 F.3d 1205, 1219 (10th Cir. 2003)(affirming summary judgment for the defendant where the plaintiff failed to produce evidence that the defendant's explanation for her transfer was pretextual).

Garcia has not met her burden and has failed to demonstrate pretext.  While Garcia claims that she is not asserting her case is a mixed motive case, she argues by analogy that, given some of the facts of the case, a mixed motive analysis may be partially applicable.  But Garcia must still produce evidence that the investigations were motivated, at least in part, by discriminatory or retaliatory intent, and she has not raised a genuine issue of material fact that there was such intent.  Furthermore, if this case were a "mixed motive" case, Garcia would not be entitled to recover compensatory damages.  See McNutt v. Board of Trustees of University of Illinois, 141 F.3d 706, 709 (7th Cir. 2000)("This statute allows courts to award injunctive relief, attorney's fees, and/or costs (but not compensatory damages) to parties proving mixed-motive discrimination under § 2000e-2(m).").  The law also severely limits the plaintiff's claims for equitable relief.  See 42 U.S.C. §2000e-2m.  Given that she has not relinquished her right to full equitable and legal relief, and there is no evidence of an improper motivation for the Defendant's actions, there is no need to analyze her case as a mixed motive case.  Garcia's assertion of pretext does not preclude the entry of summary judgment in the Defendant's favor on the Wrinkle and Johnson Investigations.

## B.    RESTORATION OF LEAVE.

The Defendant concedes that the denial of reinstatement of leave is an adverse employment action.  See Transcript of Hearing, Excerpts at 3, line 24, to 4, line 3.  The Defendant is, however, entitled to summary judgment on this claim for the same reasons set forth above about pretext.  This claim fails because Garcia was not eligible for leave restoration.

On or about December 22, 1997, Garcia asked Prewitt to approve her request to restore annual leave which she believed she was going to forfeit.  Prewitt denied Garcia's request for leave restoration because she was not eligible for the relief that she requested.  DOD regulations provide

31

that annual leave may be restored which would otherwise be forfeited if the employee requested the leave, the leave was approved, and the leave was scheduled in writing but canceled because of exigencies of the employee's service or sickness.

At no time during 1997 did DSWA require Garcia to cancel leave that the agency had previously approved. The demands of her job or illness did not prevent her from using annual leave that she had requested and that the agency approved. Moreover, DSWA lacked funds to restore the leave.

Furthermore, in 1997, Garcia had a number of opportunities, particularly in the fall and early winter of 1997, to use her annual leave. Although Garcia used sick leave during this period, she testified in her deposition that she was not ill or incapacitated. Nothing prevented Garcia from using her annual leave during that same period.

Garcia argues that the Defendant's statement that the denial of Garcia's request had nothing to do with her age, gender, national origin, or prior EEO activities is not a statement of fact, but an opinion. The Court disagrees, believes the statement is factual, and must deem it admitted based on Garcia's failure to specifically controvert each fact, as local rule 56 requires. Even if, however, Garcia is correct, and the Defendant's statement is opinion that this Court need not consider in determining whether summary judgment is appropriate, the Court shares the opinion. Garcia has not pointed to any evidence in the record to the contrary.

In her Response, Garcia did not rebut the Defendant's explanation why Prewitt denied her request. In fact, her Response does not address this claim or the Defendant's explanation. Again, Garcia has not shown pretext. The Defendant is entitled to summary judgment on Garcia's claims regarding restoration of leave.

32

### C.       DENIAL OF VSIP APPLICATION.

The Defendant does not dispute that the denial of Garcia's VSIP early retirement application was an adverse employment action. See Transcript of Hearing, Excerpts at 3, line 24, to 4, line 3. Rather, the issue is whether the Defendant's legitimate, non-discriminatory reason for denial is pretext. This claim fails because the Defendant has articulated legitimate non-discriminatory reasons for this action which Garcia cannot overcome.

DSWA's RMC initially reviewed Garcia's VSIP application on October 17, 1997. At that time, Wrinkle was conducting his inquiry. Because the RMC did not know what the inquiry would reveal, the RMC deferred action on Garcia's VSIP.

The RMC met on October 21, 1997, and the RMC once again deferred action because Wrinke had not concluded his inquiry. The RMC then met on November 13, 1997 and once again deferred taking action because it did not know the results of the inquiry. On or about November 19, 1997, RMC received a copy of Wrinkle's report and learned that Johnson would be performing an in-depth investigation. By this time, RMC knew that Johnson would not complete his investigation by December 3, 1997, the date by which all approved VSIP applicants were to be removed from the rolls. Accordingly, RMC denied Garcia's VSIP application.

The RMC also denied Garcia's VSIP application because of the seriousness of the matters that Wrinkle's report raised. The RMC knew that, if Johnson confirmed Wrinkle's findings, DSWA would, in all likelihood, fire Garcia. Given this possibility, the RMC did not think that paying Garcia $25,000.00 as incentive for retiring was appropriate under the circumstances.

Garcia contends that, under the standards identified above, motive or state of mind is key to resolution of this and other issues presented in this case and that this is a mixed motive case. Garcia

33

contends that the Defendant's arguments in favor of summary judgment all require resolution of key disputes in favor of the Defendant and against her, the non-moving party. She contends that such a result is contrary to controlling law.

Garcia's argument comes close to asserting that the Court cannot grant a motion for summary judgment on the pretext analysis of the McDonnell Douglas test, because the issue always involves state of mind or motive. That is not the law. The Tenth Circuit has frequently affirmed summary judgment for the employer on pretext grounds. See, e.g., Selenke v. Medical Imaging of Colo., 248 F.3d 1249, 1260-61 (10th Cir. 2001)(affirming entry of summary judgment for employer and finding that proferred reason for termination was not pretext for disability discrimination); Simms v. Oklahoma ex. rel. Dep't of Mental Health & Substance Abuse Servs., 165 F.3d 1321, 1330 (10th Cir.)(affirming summary judgment for employer and noting that the court's role is to "prevent unlawful hiring practices, not to act as a super personnel department that second guesses employer's business judgments") cert. denied 528 U.S. 815 (1999)(internal quotation marks and citation omitted). To avoid summary judgment, the employee must present evidence that the defendant's proferred reason is unworthy of belief. See Kendrick v. Penske Transp. Servs., 220 F.3d 1220, 1230 (10th Cir. 2000); Randle v. City of Aurora, 69 F.3d 441, 451 (10th Cir. 1995). Here, Garcia has not presented such evidence.

Garcia contends that the Defendant's statement that the RMC's decision to deny her VSIP application was not motivated to any extent by her race/national origin, her age, or her prior EEO activities is not a statement of fact, but opinion. The Court believes this contention is factual and that it must be deemed admitted based on Garcia's failure to specifically controvert each fact, as local rule 56 requires. But even if the statement were opinion, and the Court need not consider the Defendant's

34

opinion in determining whether summary judgment is appropriate, it would also be the Court's opinion.  The record does not show any evidence to the contrary.

The Defendant's supporting memorandum sets forth an explanation for the denial of Garcia's VSIP application.  See Defendant's Memorandum ¶¶ 24-28, at 9-10.  That explanation remains unrebutted.  Garcia has again failed to demonstrate pretext.  The Defendant is entitled to summary judgment on this claim.

### D.    REMOVAL AS STOCKPILE CHIEF.

This claim fails because the Defendant has articulated legitimate, non-discriminatory reasons for its action which Garcia cannot overcome.  Garcia acknowledges that her appointment as Chief of the Stockpile Control Division was a temporary one.  DSWA appointed her to the position for the purpose of allowing her to oversee the migration of data on the Project.  Both DSWA and Garcia understood that her promotion would end upon the completion of the Project or on May 13, 1998, the date that the Project was scheduled to end.

On August 8, 1997, Prewitt named Brenner as her replacement as part of a planned reorganization that began in January 1997.  This appointment ended Garcia's promotion.  The reorganization entailed the consolidation of the Nuclear Inventory Control Point Division (FCPN) with the Stockpile Control Division (FCPC).

DSWA planned the reorganization to make better use of the computer support staff and to prepare for the anticipated downsizing that would occur as a result of the early out pay incentives that the agency was offering.  DSWA subsequently consolidated the divisions, and Prewitt appointed Brenner Chief of the combined divisions.  Garcia suggested that a military officer replace her to allow her to focus on other projects, such as NUMIS-M.  There is no evidence to support Garcia's

35

contention that unlawful discrimination motivated Prewitt's decision to appoint Brenner.

Prewitt also based his decision to replace Garcia and to remove her supervisory responsibilities on Crandley's findings and on the complaints that several DSWA employees had voiced.  Crandley's report disturbed Prewitt, because it raised serious concerns about Garcia's honesty, integrity, and judgment -- qualities which are essential in a TOP SECRET work environment.  After reading the report, he lost confidence in her ability to serve as Chief of the Division.

Before Crandley's investigation, Prewitt received numerous complaints from DSWA employees unhappy with Garcia's leadership style.  See Prewitt Decl. ¶ 12, at 4.  By the time Crandley concluded his investigation, the morale in the Division was, in Prewitt's opinion, at an all time low.  Prewitt thought tensions in the workplace were running high, threatening to impact the DSWA's mission.  See id.  For these reasons, Prewitt decided to separate Garcia and Martinez from the other employees in the Division.

The Defendant's supporting memorandum sets forth the reasons that Prewitt removed Garcia as Stockpile chief.  See Memorandum ¶¶ 14-19, at 7-8.  Garcia does not dispute those facts, and the Court will deem them admitted.  See D.N.M. LR-56.1(b).  Nor did Garcia in her Response deny that her promotion was only temporary; that her removal was part of a planned reorganization that began in January 1997; that, based on Crandley's findings, Prewitt had lost confidence in her; and that numerous employees had complained about her managerial style.  All these factors, in Prewitt's opinion, warranted her removal.  In her Response, Garcia did not point to any evidence indicating that the Defendant's explanation for removal was pretextual.   The Defendant is entitled to summary judgment on this claim.

**E.      TAKING ALL EVIDENCE TOGETHER TO SEE IF THERE IS A GENUINE ISSUE OF PRETEXT ON ANY CLAIM.**

Unable to establish that there is a genuine issue of pretext on the investigations, the restoration of leave, the denial of the VSIP application, and her removal as stockpile chief, Garcia invites the Court to take all her evidence together as evidence of pretext, without reference to a specific action by the Defendant or his agents.  She disclaims exclusive reliance on the particular Defendant actions she alleged in her EEO complaint and suggests that each and every Defendant action is a separate claim.  Garcia contends that she has produced evidence of pretext for all of the Defendant's individual actions and that any argument to the contrary is inaccurate.

Rather, however, than pointing to specific evidence, she maintains that her entire affidavit abounds with evidence that the Defendant's neutral, non-discriminatory rationales are unworthy of belief.  She states that she has documented an escalating pattern of hostility and harassment that demonstrates significant material issues of disputed fact requiring a trial on the merits of this action. Garcia is apparently attempting to create a genuine issue of "pretext" without linking it to a particular action or adverse employment action.  Even assuming she may do so, the Court does not believe this proffered evidence creates a genuine issue of fact on pretext for any of the Defendant's actions.

### 1.      Bruno and Prewitt's Allegedly Derogatory Comments.

Given that Bruno retired in 1995, there is no evidence that his comments were in any way related to actions taken against her after he retired.  The same analysis applies to the comments that Prewitt allegedly made.  While Garcia does not, in her brief or affidavit, specifically date Prewitt's similar remarks, a reasonable inference from her statement of facts is that Bruno and Prewitt made them together or contemporaneously.  If that is the case, for the same reason that Bruno's comments

do not support Garcia's allegations of discrimination, Prewitt's do not support discrimination either. See, e.g., Geier v. Medtronic, Inc., 99 F.3d 238,  242 (7th Cir. 1996)("To be probative of discrimination, isolated comments must be contemporaneous with the [adverse action] or causally related to the [adverse action] decision making process.").

In her deposition, however, Garcia testified that Prewitt made two comments that she considered age derogatory.  The first occurred in 1996 when Prewitt stated that "we older people [meaning he and Garcia] need to be careful about what we say" to Bruno, given his age. See Garcia Depo. at 31.  The second comment occurred in August 1997 when Prewitt allegedly stated that Martinez was old enough to retire and should retire.  Prewitt's comments are not evidence of age discrimination, because they are isolated and unrelated to any employment decision or patterns of decision making.  See Cone v. Longmont United Hospital Association, 14 F.3d 526, 531 (10th Cir. 1994)(holding that, for age-related comments to have probative value, they must directly relate to a particular person, employment decision, or pattern of decision making; ambiguous comments or comments which are "[i]solated . . . , unrelated to the challenged action, are insufficient to show discriminatory animus.").

Finally, Garcia is now alleging that Prewitt made derogatory comments about her age. Garcia's affidavit alleges that Prewitt stated that she was old.  See Garcia Aff. ¶7, at 2 ("7. Col. Prewitt and Navy Commander Bruno made open derogatory comments in front of me, saying I was old and that my deputy, Mr. Alfred Martinez, was old and should retire.").  Garcia's affidavit provides no date for these alleged derogatory comments.  This allegation is at tension with her deposition testimony.  See, e.g., Garcia Depo. at p. 119, lines 4-17 (Garcia is unable to identify any harassment comments by Prewitt in or after August 1997).  The Defendant argues that the Court should

strike paragraph 7 of her affidavit because it contradicts her prior sworn testimony with regard to age-related remarks that Prewitt made. The Defendant attaches a deposition excerpt from 1999 in Martinez' case. In that case, Garcia, who was a witness, testified:

Q. Okay. So he made a comment in 1996. What was the comment?

A. It was -- it had to do with Commander Bruno, and I made the statement to Commander Bruno when I was giving him some direction on something that he was still a kid, and Bruno took that to Colonel Prewitt, because I had made the statement that he was just a young kid and he made the statement, "Well, you know, we older people need to be careful about what we say," you know, "older," implying that I was already old and shouldn't make those comments.

Q. Were you, in fact, older than Commander Bruno?

A. Oh, yes, definitely.

Q. What were his words again, give them to me again?

A. "We older people need to be careful."

Q. Meaning you and he?

A. Yes.

Q. "Need to be careful about how we address others?"

A. And, then, he laughed, yes, and said "You know, these young kids don't understand" or something.

Q. So you take that to be a derogatory comment about age?

A. Yes. It was more involved, it went on longer than that. He made some derogatory comments based on the fact that I was already old. I already knew that, he didn't have to tell me.

Q. Did he make any other comments?

A. Yes. comments like Marty was -- Mr. Martinez was old enough and he should retire, and this was the time when all this stuff was going on, he should take leave and retire.

See Deposition of Mary J. C. Garcia at 31, line 1, to 32, line 11 (taken November 15, 1999).
Garcia's testimony four years earlier is more elaborate and is at tension with the substance of her
affidavit, which has no dates.

Garcia's position that these comments constitute discrimination lacks support in the law.   A
party cannot create a genuine issue of fact to survive summary judgment by filing affidavits contrary
to prior sworn testimony.   See Cleveland v. Policy Management Systems Corp., 526 U.S. 795, 804
(1999); Frank v. Nimms, 796 F.2d 1230, 1237 (10th Cir. 1986).  Even if the Court does not consider
Garcia's affidavit contradictory to her 1999 deposition testimony, that deposition testimony does not
show that any alleged derogatory comments by Prewitt create any genuine issue of pretext.  First,
"[a]lthough such comments may serve as circumstantial evidence of discrimination, the plaintiff must
still show some nexus between the statements and the defendant's [adverse employment] decision .
. . ." Shorter v. ICG Holdings, Inc., 188 F.3d 1204, 1209-10 (10th Cir. 1999)(internal citations
omitted).   Second, as the Tenth Circuit has noted, an isolated, stray remark is insufficient to
demonstrate that an employer's proffered legitimate, non-discriminatory reasons are pretextual.  See
McKnight v. Kimberly Clark Corp., 149 F.3d 1125, 1129 (10th Cir. 1998); Cone v. Longmont United
Hosp. Ass'n, 14 F.3d 526, 531 (10th Cir. 1994).

### 2.    **Affirmative Employment Plan.**

Garcia alleges that the Secretary of the Air Force published the Affirmative Employment Plan,
which shows that Hispanics are under represented at grade 14.  Garcia does not fully explain how
these alleged facts are probative of the issues before this Court.  At best, Garcia says the Plan tends
to demonstrate the existence of a discriminatory atmosphere against her.  The Court requires more
than that for evidence to be relevant to the issues presented in this case.  These alleged statements

of facts are not relevant to the issues of discrimination or constructive discharge.

Moreover, the parties did not attach the Plan to any of their papers, so the plan is not before the Court.  Hence, what Garcia submits in her affidavit is her interpretation of or observations about the Plan.  Garcia's interpretation of the plan is hearsay.  Her affidavit does not suggest that her testimony falls within the purview of any rule 803 exception.  See Starr v. Pearle Vision, Inc., 54 F.3d 1548, 1555 (10th. Cir. 1995)(holding that rule 56 precludes the use of inadmissible hearsay to support or oppose summary judgment).  The Affirmative Employment Plan published by the Secretary of the Air Force might be admissible as a public record or report pursuant to rule 803(8), in which the declarant's availability is immaterial.  See, e.g., Bridgeway Corp. v. Citibank, 201 F.3d 134, 143-44 (2d Cir. 2000)(deeming federal agency report trustworthy); Zeus Enters. v. Alphin Aircraft, Inc., 190 F.3d 238, 241 (4th Cir. 1999)(holding that administrative law judge's decision was admissible under rule 803(8)(c) where ALJ conducted investigation and fact finding was result of that investigation.) While Garcia states in her affidavit that the under-representation of females at her grade level is reported as the result of an investigation, all that is before the Court are Garcia's observations about the Plan.  Accordingly, Garcia's statement of facts are based on inadmissible hearsay.[3]

### 3.   Prewitt's Comments Before and After Complaints to Spencer.

The only specific affidavit that Garcia highlights as evidence of pretext is in her own affidavit and apparently relates to her retaliation claim:

> 16.   Before I informed my supervisor Prewitt that I had complained to Spencer, Prewitt assured me that the most he would do if the time card abuse allegation were true would be to give me a letter of counseling and keep it himself for

---

[3] The Defendant has moved to strike paragraphs 12 and 13 of Garcia's statement of facts. The Court does not see any reason to strike the allegations, but will not consider them in determining this motion.

120 days.

17. After I complained of discrimination to Spencer and Prewitt, Prewitt accused me of receiving unmerited overtime payments for 15.5 hours, in February 1997 and 8 hours on 1 March 1997.

Garcia Aff. ¶¶ 16, 17, at 4. The apparent suggestion here is that Prewitt had the authority to prevent any disciplinary actions against Garcia for time card abuse and would have done no more than the letter of counseling if Garcia had not complained of discrimination to Spencer. This assertion is without support in the record.

Once the anonymous allegations of time card abuse were made, Prewitt had no authority to prevent an investigation. See Prewitt Decl. ¶ 5, at 2 ("I played no role in the decision to initiate the investigation, nor did I have the authority to stop the investigation once underway. Pursuant to DOD regulations, investigations are mandatory for all complaints lodged with the Hotline."). Further, Prewitt testified that he had assumed Garcia would be exonerated and was surprised and disappointed by the results of the Crandley investigation. See Prewitt Decl. ¶ 8, at 3. There is no evidence which suggests that Prewitt's decision that disciplinary action was warranted was related in any way to Garcia's complaints of discrimination. The evidence is that Prewitt never expected the allegations against Garcia to be substantiated and he and Sedivy conducted extensive investigations to verify the support for time card abuse violations before actually disciplining Garcia.

## III.   DEFENDANT IS ENTITLED TO SUMMARY JUDGMENT ON GARCIA'S CONSTRUCTIVE DISCHARGE CLAIM.

Garcia alleges that she was forced to resign from DSWA in January 1998 because: (i) she was subjected to "several" investigations (Crandley's, Wrinkle's and Johnson's), see Complaint ¶ 58, at 12; (ii) she was denied a voluntary separation incentive payment; (iii) Brenda Casaus harassed and

42

spied on her, see Complaint ¶¶ 53, 54, 56, and 58, at 11-12; (iv) Prewitt failed to investigate an employee who threatened her, see id. ¶ 57, at 11; (v) she was denied her security access to Top Secret information, see id. ¶ 59, at 12; and (vi) Prewitt and Sedivy stripped her of her duties and left her without a job, see id. ¶ 62, at 12.  The Defendant contends that Garcia's allegations are inaccurate, incomplete, and represent a subjective view of the events leading up to her resignation in 1998.  In any case, Garcia has not shown that these events meet the Tenth Circuit's high standards for constructive discharge.  The claim for constructive discharge fails because there is no factual support for the claim.

### A.   GARCIA'S CONSTRUCTIVE DISCHARGE CLAIM FAILS FOR SEVERAL REASONS.

First, the Defendant has articulated legitimate, nondiscriminatory reasons for all of the actions about which Garcia complains.  As shown above, she has failed to rebut these reasons or to demonstrate pretext.  Thus, if the predicate acts underpinning her claim were nondiscriminatory, then Garcia was not, as she alleges, constructively discharged.  See Godinet v. Management & Training Corp., 994 F. Supp. 1348, 1354 (D. Kan. 1998)("To establish constructive discharge, plaintiff must demonstrate that defendant, by its illegal discriminatory acts, made working conditions so difficult that a reasonable person in his position would feel compelled to resign.")(emphasis added).

Second, Garcia has not presented evidence demonstrating the existence of aggravating circumstances, as the Tenth Circuit requires.  See James v. Sears Roebuck & Co., 21 F.3d at 992.

Third, the timing of her departure from the agency is inconsistent with her contention that she was forced from the workplace.  On the contrary, it demonstrates that she left voluntarily.

**B.      ALLEGATIONS ABOUT DISCRIMINATION AND THE PROBLEMS WITH HER TIME CARDS .**

Although the relevancy of certain facts is not completely clear, Garcia appears to be suggesting that her thirty day suspension and Prewitt's refusal to allow her to amend her time and attendance records were factors playing a prominent role in her decision to resign from DSWA in January 1998.  The Court does not believe that these facts rise to the level that the Tenth Circuit requires for constructive discharge.

The Defendant goes further and argues that the two factors are not even relevant and that the Court should not even consider them.  The Defendant states that the doctrine of res judicata precludes Garcia from contending that these actions were discriminatory and forced her from the work place. It is not at all clear, however, that res judicata or collateral estoppel is available here.

The Supreme Court of the United States has "long favored application of the common-law doctrines of collateral estoppel (as to issues) and res judicata (as to claims) to those determinations of bodies that have attained finality. Astoria Fed. Sav. & Loan Ass'n. v. Solimino, 501 U.S. 104, 107 (1991).  Res judicata requires the satisfaction of four elements:  (i) the prior suit must have ended with a judgment on the merits; (ii) the parties must be identical or in privity; (iii) the suit must be based on the same cause of action; and (iv) the plaintiff must have had a full and fair opportunity to litigate the claim in the prior suit.  See Nwosun v. Gen'l Mills Restaurants, Inc., 24 F.3d 1255, 1257 (10th Cir. 1997), cert. denied, 523 U.S. 1064 (1998).  Addressing similar concerns, the Supreme Court has also held that an administrative decision must satisfy three fairness requirements: (i) the agency must have been acting in a judicial capacity; (ii) it must be resolving issues that are properly before it; and (iii) the parties must have an adequate opportunity to litigate those issues before the

44

agency.  See United States v. Utah Constr. & Mining Co., 384 U.S. 394, 422 (1966).  In this case, all requirements have been met.

Garcia does not dispute that the administrative judge's Initial Decision finding of no discrimination is a judgment on the merits in the Defendant's favor.  There also does not appear to be any dispute that Garcia had a full and fair opportunity to litigate this claim, and the prior litigation involved the same parties currently before this Court.  The administrative judge engaged in a thorough and far reaching examination of Garcia's claims arising from her suspension and Prewitt's refusal to allow her to amend her time records.  The administrative decision notes that Garcia used the "swipe" records kept by DSWA to support her defense, which she presumably would not have had unless she was able to conduct some discovery or enjoyed some access to documents.  Further, the officer conducting the hearing ruled with respect to Garcia's claims.  The Court sees no reason to question, on the record before it, that the administrative hearing comported with judicial standards or that the agency was acting in a judicial capacity.

Similarly, Garcia has presented the Court with no reason to doubt that the administrative hearing satisfies the second and third factors of United States v. Utah Constr. & Mining Co., i.e., that the hearing officer was resolving issues of fact properly before it and that Garcia had an adequate opportunity to litigate those issues.  C.f. Atiya v. Salt Lake County, 988 F.2d 1013, 1019 (10th Cir. 1993)(concluding that the parties at an administrative proceeding were given an adequate opportunity to litigate the issues, noting that both parties "were represented by counsel, opening and closing statements were made, witnesses were examined and cross-examined, exhibits introduced and . . . the hearing itself extended over some six days.").  Garcia was suspended, she presented evidence to support her contentions, and she discontinued her appeal of the administrative ruling on that issue.

Garcia's concern is that the Defendant is attempting to extend the doctrine of res judicata to encompass matters that she did not present for adjudication before the MSPB.  Specifically, Garcia contends that she had no opportunity to litigate before  the MSPB the question of the ongoing hostility directed at her after her thirty-day suspension was complete.  But the Court does not understand the Defendant to be arguing that she is precluded from arguing that the circumstances following her thirty-day suspension could be evidence of ongoing hostility, discrimination, and retaliation.  This period of time falls outside the ambit of issues that res judicata encompasses as a result of the MSPB proceedings.

The limited argument that the Defendant makes has merit.  In many cases, the doctrine of res judicata or collateral estoppel would estop Garcia from arguing that her thirty-day suspension and Prewitt's refusal to allow her to amend her time-and-attendance records were discriminatory occurrences that played a prominent role in her constructive discharge.  However, some federal statutory schemes abrogate this federal common law rule.  See Astoria Fed. Sav. & Loan Assoc. v. Solomino, 501 U.S. at 110; Univ. of Tenn. v. Elliott, 478 U.S. 788, 799 (1986).  The Supreme Court in Chandler v. Roudebush, 425 U.S. 840 (1976), "held that a federal employee whose discrimination claim was rejected by her employing agency after an administrative hearing was entitled to a trial de novo in federal court on her Title VII claim."  Univ. of Tenn. v. Elliott, 478 U.S. at 795.  After reviewing in considerable detail the language of Title VII and the history of the 1972 amendments to the statute, the Supreme Court concluded:

> The legislative history of the 1972 amendments reinforces the plain meaning of the statute and confirms that Congress intended to accord federal employees the same right to a trial de novo [following administrative proceedings] as is enjoyed by private-sector employees and employees of state governments and political subdivisions under the amended Civil Rights Act of 1964.

46

Chandler v. Roudebush, 425 U.S. at 848.  The Supreme Court in Univ. of Tenn. v. Elliott stated that "[t]he question actually before us is whether a common-law rule of preclusion would be consistent with Congress' intent in enacting Title VII."  478 U.S. at 796.  The Elliott court concluded "that the Sixth Circuit correctly held that Congress did not intend unreviewed state administrative proceedings to have preclusive effect on Title VII claims."  Id.

Given these Supreme Court opinions and the Tenth Circuit's statements in Brockman v. Wyoming Dep't of Family Servs., the Court cannot conclude that Garcia's Title VII and ADEA claims, or any part of them, are barred by collateral estoppel or res judicata.  The hearing officer's factual findings will not have preclusive force here, leaving her free to prove liability on the part of the Defendant.

That the Court will consider the suspension and the refusal to allow Garcia to correct the time cards does not mean that a reasonable factfinder could find constructive discharge from these events.  At the hearing, the Defendant's counsel indicated that DSWA had never allowed an employee to correct time records after allegations of time card abuse had been made.  See Transcript of Hearing, Excerpts at 2, lines 2-25.  Similarly, Garcia's suspension was a direct result of her own misconduct; there is no evidence that discriminatory animus or retaliatory intent was behind the decision to suspend her. Combining her suspension and the refusal to allow her to correct her time cards with the other factors in this case does not establish a genuine issue of material fact that Garcia was constructively discharged.  Hence, these two factors would not, under the high standards of Tenth Circuit law, support a finding of constructive discharge.

**C.     BRUNO'S AND PREWITT'S COMMENTS COULD NOT HAVE FORCED HER TO RESIGN.**

The Defendant argues that Bruno's age-related derogatory comments in 1995 and Prewitt's comments in 1996 are of no evidentiary value.  While there is no specific time limitation on the relevance of comments to claims of discrimination, the remoteness in time of discriminatory comments may have bearing on the weight given to such evidence.  Where a decision maker in a discrimination case makes the comments, this tends to weigh in favor of Garcia.  See Watts v. City of Norman, 270 F.3d 1288, 1296 (10th Cir. 2001)(citing Reeves v. Sanderson Plumbing Prods., Inc., 533 U.S. 133, 151-53 (2000)).  In Reeves, the Supreme Court emphasized the relevancy of conduct showing the decision maker's discriminatory attitudes preceding the challenged decision.  A fact finder could not, however, reasonably infer that Garcia left the Defendant in 1998 because of remarks that Bruno allegedly made three years earlier.

The same analysis applies to the comments that Prewitt allegedly made.  And while Garcia does not, in her briefs or evidence, specifically date Prewitt's similar remarks, a reasonable inference from her statement of facts is that Bruno and Prewitt made them together or at the same time.  For the same reason that Bruno's comments do not support Garcia's allegation of constructive discharge, Prewitt's does not support constructive discharge either.

As noted earlier, in her deposition, Garcia testified that Prewitt made two comments that she considered age derogatory.  The first occurred in 1996 when Prewitt stated that "we older people [meaning he and Garcia] need to be careful about what we say" to Bruno, given his age.  See Garcia Depo. at 31.  The second comment occurred in August 1997 when Prewitt allegedly stated that Martinez was old enough to retire and should retire.  As noted before, Prewitt's comments are not

evidence of age discrimination, because they are isolated and unrelated to any employment decision or pattern of decision making.

Moreover, the 1995 and 1996 comments are too remote in time to support Garcia's contention that they were factors motivating her resignation in January 1998. While Prewitt was a key decision maker, the Court agrees with the Defendant's contention that Prewitt's comments were isolated. The Court does not believe that Garcia's affidavit and deposition testimony documents a long-standing pattern of attitude and conduct, even if the specific comments are one of the manifestations thereof, that Tenth Circuit law requires to establish constructive discharge.

**D.    THERE IS NO FACTUAL SUPPORT FOR GARCIA'S CONTENTION THAT CASAUS' BEHAVIOR AND PREWITT'S FAILURE TO INVESTIGATE A THREAT AGAINST HER FORCED HER TO RESIGN.**

In her deposition, Garcia admitted that Casaus' alleged harassment and Prewitt's failure or refusal to investigate occurred before June 1997, seven months before her resignation. See Garcia Depo. at 123, lines 13-16. Consequently, their actions are too far removed to reasonably suggest that they played a role in Garcia's decision to resign. Moreover, Garcia has not pointed to any evidence that suggest unlawful discrimination motivated Casaus' and Prewitt's actions. Her deposition testimony suggests she had no evidence or reason to believe unlawful discrimination motivated Casaus' behavior. See id. at 121, lines 10-15 ("Q. So you don't know if it was because you're a woman, you don't know if it's because you're older, you don't know if it's because you're Hispanic, is that right? You don't know any of these things, because you can't put yourself in Brenda's body -- A.  True.").

**E.   THERE IS NO FACTUAL BASIS FOR GARCIA'S CONTENTION THAT DSWA'S DENIAL OF TOP SECRET INFORMATION FORCED HER TO RESIGN.**

At no time did DSWA suspend or revoke Garcia's security clearance.  Nor did DSWA ever deny her access to the NUMIS-M work space after Prewitt removed her from the Project and replaced her with Brenner.  Once Prewitt removed Garcia from the project, however, DSWA restricted her access to the TOP SECRET work space and data, because DSWA grants access to the area on a strict "need to know" basis.  Garcia does not dispute those allegations.  Garcia does not present evidence that DSWA imposed the restriction because of Garcia's age, race, national origin, gender, or prior EEO activities.

**F.   HER REMOVAL AS STOCKPILE CHIEF IS NOT EVIDENCE OF CONSTRUCTIVE DISCHARGE.**

Garcia's constructive discharge claim is based primarily on Prewitt's decision to appoint Brenner as her replacement in August 1997.  As noted above, however, Prewitt did so for legitimate, non-discriminatory reasons.  As such, Garcia cannot use Prewitt's decision to support her contention that DSWA forced her to resign in January 1998.

Even if Prewitt had removed Garcia as Stockpile Chief for discriminatory reasons, her removal did not amount to a constructive discharge, for a number of reasons.  First, there are no aggravating circumstance present in this case.  DSWA did not subject her to a steady stream of threats, slurs, or epithets rendering working conditions intolerable.

Second, the fact that Prewitt removed Garcia as Stockpile Chief in August 1997 but she did not quit until December 23, 1997, indicates that her working conditions were not intolerable.  According to Garcia, she knew by August or certainly by September that she had no job; that DSWA

had restricted her entry into the work space; that she had no office; that DSWA was investigating her further; and that DSWA was going to suspend her.  Nothing else occurred between September 1997 and January 1998 to render Garcia's working conditions worse.

Hence, conditions in January were no worse than they were in September.  Garcia does not address why she waited until January to resign.  Moreover, there is tension between Garcia's allegation that deteriorating conditions  drove her from the work place after September when she essentially stopped work for DSWA after going on leave in August.

Between August 16, 1997, and December 19, 1997, Garcia worked 28 hours.  That Garcia was able to time her departure four months after Prewitt removed her as Stockpile Chief indicates that she gave her resignation freely.  See Yearous v. Niobrara County Mem. Hosp. by and through Bd. of Trustees, 128 F.3d 1351, 1356 (10th Cir. 1997)(holding that an employer has not constructively discharged an employee who has complete control over the effective date of his resignation); Hirschfeld v. New Mexico Corrections Dep't, 916 F.2d 572, 580 (10th Cir. 1990)(finding that no constructive discharge occurred where there is a four month delay between the alleged discriminatory acts and the resignation); Steele v. Offshore Shipbuilding, 867 F.2d 1311, 1317 (11th Cir. 1989)(same; 11 month delay).

**IT IS ORDERED** that the Defendant's Motion for Summary Judgment is granted and judgment is entered in Defendant's favor on all claims.

_____
UNITED STATES DISTRICT JUDGE

Counsel:

Dennis W. Montoya
Montoya Law Firm, Inc.
Albuquerque, New Mexico

    *Attorney for Plaintiff*


David C. Iglesias
  United States Attorney
Michael H. Hoses
  Assistant U.S. Attorney
Albuquerque, New Mexico

    *Attorneys for Defendant*